IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| QUATAMA PARK TOWNHOMES OWNERS ASSOCIATION, an Oregon nonprofit corporation, | Case No. 3:18-cv-00023-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| RBC REAL ESTATE FINANCE, Inc., a foreign corporation; LAMPLIGHT CAPITAL & ASSET MANAGEMENT, LLC, a Texas limited liability company; DECATUR ADVISORS LLC, a California limited liability company; SCOTT MCFERRAN, an individual; LAURA WILSON, an individual; DARON ANDERSON, an individual, | |
| Defendants. | |

**BECKERMAN, U.S. Magistrate Judge.**

Defendants Scott McFerran ("McFerran"), Laura Wilson ("Wilson"), Daron Anderson ("Anderson"), and Decatur Advisors LLC ("Decatur") (collectively, "Defendants") move to disqualify the law firm of Vial Fotheringham ("VF") from continuing to represent Plaintiff Quatama Park Townhomes Owners Association ("Association") in this action. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332. Defendants argue that VF formerly

PAGE 1 – OPINION AND ORDER

represented defendants McFerran, Wilson, and Anderson (collectively, the "Directors") in a substantially related matter, thus VF's current representation of the plaintiff in this case is a conflict of interest warranting disqualification. For the reasons that follow, the Court agrees and GRANTS Defendants' Motion to Disqualify Counsel.

## BACKGROUND

This litigation arises from a dispute regarding alleged construction defects at Quatama Park Townhomes ("Quatama Park"), a planned community located in Washington County, Oregon. (Compl. ¶ 1.) Quatama Park was originally developed and constructed by companies owned by James Standring ("Standring"). (*Id.* ¶ 5.) In 2011, construction lender RBC Real Estate Finance, Inc. ("RBC") foreclosed on Quatama Park and became the successor declarant for the development. (Pl.'s Resp. at 1.) RBC then hired Decatur to manage the development. (Defs.' Mot. at 2; Pl.'s Resp. at 2.) RBC appointed Wilson and Anderson, consultants hired by Decatur, to serve as the sole members of the Association's Board of Directors (the "Board") until control was turned over to the lot owners. (Defs.' Mot. at 2; Pl.'s Resp. at 2.) In July 2013, Lamplight Capital & Asset Management, LLC ("Lamplight") purchased RBC's interest in Quatama Park and reappointed Anderson and Wilson as the Association's Directors. (Pl.'s Resp. at 5; Vial Decl. Ex. 1, at 1.) In August 2015, Anderson stepped down from the Board and Lamplight appointed McFerran, who is also a principal of Decatur, to replace him. (Defs.' Mot. at 2; Pl.'s Resp. at 5; Vial Decl. Ex. 1, at 1.)

In July 2015, the Board hired the VF law firm to provide general representation services to the Association. (Pl.'s Resp. at 7; *see generally* Vial Decl. Exs. 22-23.) VF's representation agreement was addressed to the Association's Board of Directors and signed by Wilson as the "Authorized Representative" of the Association. (Vial Decl. Ex. 23, at 1.) In November 2015, the Association retained VF on a contingent fee basis to file a lawsuit against Standring's companies

PAGE 2 – OPINION AND ORDER

and other contractors seeking damages for repairs related to a variety of construction defects discovered throughout the development. (Defs.' Mot. at 1-2; Pl.'s Resp. at 8; Vial Decl., Ex. 25, at 1-2.)[1] McFerran signed the contingent fee agreement as the "Authorized Representative" of the Board. (Vial Decl. Ex. 26, at 6.)

VF filed the construction defect lawsuit (hereinafter "*Quatama I*") on behalf of the Association in February 2016. (Pl.'s Resp. at 9; Defs.' Reply at 6.) Prior to filing the lawsuit, VF attorney Ryan Harris ("Harris") emailed Wilson and McFerran and stated, "[i]f either of you have any other documents showing other potential defendants, please provide them to me." (Vial Decl. Ex. 29, at 1.) Wilson and McFerran did not provide any documents in response to Harris' request. (Pl.'s Resp. at 10.)

In August 2016, counsel for the *Quatama I* defendants (i.e., Standring's companies) issued subpoenas to Wilson and Decatur for all documents relating to the Quatama Park development. (*See generally* Vial Decl. Exs. 30-31.) Subsequently, between August and October, Wilson and McFerran provided their complete files on the development to VF. (Pl.'s Resp. at 10; Wilson Decl. ¶ 5; McFerran Decl. ¶ 4.) Anderson also provided VF with a complete file of all of his documents related to the development.[2] (Anderson Decl. ¶ 4.) The Directors assert that they turned over their files to VF because they believed VF represented them. (Defs.' Reply at 9; Wilson Decl. ¶ 5; McFerran Decl. ¶ 4; Anderson Decl. ¶ 4.) However, the Association argues

---

[1] Plaintiff alleges that Wilson and Anderson were aware of these defects as early as February 2012, but hid that fact from VF, ultimately causing the Association to lose the lawsuit. (Pl.'s Resp. at 2-5.) Defendants, on the other hand, assert that "[n]o Director hid anything or misled anyone." (Defs.' Reply at 8.) This factual dispute is a central issue in this litigation, but it is unnecessary to resolve it for the purpose of deciding this motion.

[2] It is not clear from the record when Anderson provided his file on Quatama Park to VF. Further, it does not appear that Anderson was subpoenaed by the *Quatama I* defendants. (*See generally* Vial Decl. Exs. 30-31.)

that the Directors were required to provide the documents to VF in any event because the documents had been subpoenaed. (Pl.'s Resp. at 10.) However, all parties appear to agree that Harris requested that Wilson and McFerran provide the documents to VF prior to responding to the subpoenas in order to allow VF to review them for privileged communications. (Pl.'s Resp. at 32; Defs.' Reply at 6.)

While the parties dispute the timing, at some point in reviewing the Directors' files, VF discovered documents that the Association alleges established that the Directors knew about the construction defects at Quatama Park as early as 2012.[3] (Pl.'s Resp. at 11-12; Defs.' Reply at 8.)

During the summer months of 2016, several homeowners threatened to sue Lamplight, Wilson, and McFerran regarding costs associated with repairs for the Quatama Park construction defects. (Defs.' Reply at 11-12.) In June 2016, a homeowner ("JM") emailed Harris suggesting that Wilson and McFerran were breaching their fiduciary duties to the homeowners by commencing repairs for the construction defects without knowing whether they would ever recover the costs. (Miller Decl. Ex. 7, at 1.) Harris emailed Wilson and McFerran, asking them if he could respond, and they agreed. (Miller Decl. Ex. 8, at 1.) Harris then sent a letter to JM, stating "disagreement do [sic] not mean that the Board is breaching its fiduciary duty." (Miller Decl. Ex. 8, at 4-5.) During the two months that followed, Harris met with Wilson and McFerran by telephone and in person on several occasions to discuss the homeowners' allegations. (Defs.' Reply at 11-12.)

---

[3] The Association asserts that Harris did not discover these documents until shortly before sending the June 2017 "non-representation" letter, but Defendants claim that the Directors had numerous conversations with Harris during the summer of 2016 about their discovery of the construction defects. (Pl.'s Resp. at 11-12; Defs.' Reply at 8.) It is unnecessary for the Court to resolve this factual dispute for the purpose of deciding this motion.

On August 29, 2016, Damon Henrie ("Henrie"), an attorney for several homeowners, sent a letter to Harris and Marcus Eyth ("Eyth"), counsel for Lamplight and RBC, to place Lamplight, Wilson, and McFerran "on notice of my clients' intent to pursue claims against each of these entities . . . ." (Miller Decl. Ex. 14, at 1-2.) On September 1, 2016, Harris drafted and sent a response to Henrie, after soliciting feedback from Wilson and McFerran on an initial draft. (McFerran Decl. to Decatur Defs.' Reply Ex. F, at 1-4.)

In January 2017, the *Quatama I* defendants moved for leave to amend their third party complaint to assert claims against the Directors in their individual capacities for contribution based upon their alleged breach of fiduciary duty for failing to make timely repairs at the development. (Defs.' Mot. at 24; Pl.'s Resp. at 9-10; *see generally* Miller Decl. Ex. 11.) VF tendered the claims to the Directors and Officers ("D&O") insurance carrier on behalf of the Directors. (Defs.' Reply at 4-5.) The D&O insurance carrier responded directly to VF. (Decatur Defs.' Reply at 4-5; McFerran Decl. to Decatur Defs.' Reply Ex. G, at 2.)

At the end of March 2017, Wilson and McFerran stepped down from the Board as part of a planned transition to homeowner control of the Association. (Pl.'s Resp. at 11.) Shortly before the Board turnover, Harris emailed Wilson and McFerran to inform them that he had received a settlement offer from the *Quatama I* defendants. (Vial Decl. Ex. 34, at 1-2.) Harris stated he believed "we can do better than [the offer]," and recommended that Wilson and McFerran defer the decision to the Association's new board of directors. (*Id.* at 1.) Wilson and McFerran each responded that they agreed with that course of action. (*Id.*)

In April 2017, the *Quatama I* defendants filed a motion for summary judgment, arguing that the Directors knew about the construction defects more than two years before the lawsuit was filed, thus it was time-barred. (*See generally* Vial Decl., Ex. 39.) The same month, Harris

exchanged several emails with the Directors regarding scheduling their depositions in *Quatama I*. (Miller Decl. Ex. 10, at 1-10.) In one of these emails, Wilson asked Harris whether they should postpone the deposition preparation they had previously scheduled because the depositions had been postponed. (*Id.* at 5.)

In May 2017, VF sent a letter to Eyth stating that the recently-elected board of directors did not believe it was in the Association's interests to sign a common interest agreement between the Association, Wilson, Decatur, RBC, and Lamplight.[4] (Vial Decl. Ex. 36, at 1-2.)

On June 19, 2017, Harris sent a letter to the Directors informing them that the Association was considering filing a breach of fiduciary duty lawsuit against them based on their failure to file a timely lawsuit after their discovery of the construction defects. (Vial Decl. Ex. 42, at 1-2.) The letter stated, "it appears . . . the Association's interests are no longer aligned with your interests." (*Id.* at 1.) Harris informed the Directors that while he had initially intended to defend their depositions as former directors and officers of the Association, he could no longer do so, and that they should consult their own counsel. (*Id.* at 1-2.) The Directors each attest that until around the time they received this letter, they believed VF represented them as individuals. (Wilson Decl. ¶ 7; McFerran Decl. ¶ 7; Anderson Decl. ¶ 6.)

As a result of receiving the letter, the Directors retained attorney Kurt Peterson ("Peterson") to represent them. (McFerran Decl. ¶ 9.) On July 10, 2017, Peterson sent a letter to Harris, objecting to subpoenas Harris intended to serve upon the Directors, and stating "my clients very definitely believe that they had an attorney-client relationship with your firm." (Miller Decl. Ex. 2, at 1-2.) On July 17, 2017, Peterson sent a letter to VF attorney Michael Vial

---

[4] The parties had drafted, but never executed, a common interest agreement in February 2016, shortly after the Association filed *Quatama I*. (Harris Decl. ¶ 11.)

("Vial") informing him that if VF pursued litigation against the Directors on behalf of the Association, he would move to disqualify VF as counsel. (Miller Decl. Ex. 4, at 2.)

In August 2017, the Washington County Circuit Court granted the defendants' motion for summary judgment in *Quatama I*. (*See generally* Miller Decl. Ex. 16.)

In October 2017, the Association filed this lawsuit in Washington County Circuit Court, asserting claims for fraud, negligent misrepresentation, breach of fiduciary duty, and unlawful trade practices. (ECF No. 1, Attach. 2.) In January 2018, Defendants removed the action to federal court. (ECF No. 1.) In May 2018, the Directors filed the motion to disqualify counsel currently before the Court.[5] (ECF No. 21.) Defendants Decatur and McFerran (collectively, the "Decatur Defendants") filed a notice of joinder in the motion. (ECF No. 22.)

## ANALYSIS

### I.     STANDARD OF REVIEW

The district court has discretion to disqualify an attorney as a function of its responsibility for controlling the conduct of lawyers practicing before the district court. *Gas–A–Tron of Az. v. Union Oil Co.*, 534 F.2d 1322, 1325 (9th Cir. 1976) (noting that a district court may use its discretion to disqualify an attorney if there is a sound basis for doing so). "The competing interests involved in a conflict of interest case require the court to strike a delicate balance that prevents unreasonable restrictions on an attorney's ability to practice law while nonetheless upholding the system's integrity requiring a high standard of proof on the party moving to disqualify . . ." *Brooks v. Caswell*, No. 3:14–cv–1232–AC, 2015 WL 1137416, at *4 (D. Or. Mar. 12, 2015) (citing *Smith v. Cole*, No CV 05–372–AS, 2006 WL 1207966, at *1–*2 (D. Or.

---

[5] A motion to disqualify counsel is a nondispositive motion, and therefore a magistrate judge has jurisdiction to resolve it pursuant to 28 U.S.C. § 636(b)(1)(A). *See Howe Inv., Ltd. v. Perez Y Cia. de Puerto Rico, Inc.,* 96 F. Supp. 2d 106, 113 (D.P.R. 2000) (holding that a motion to disqualify is a nondispositive motion over which a magistrate judge has jurisdiction).

PAGE 7 – OPINION AND ORDER

Mar. 2, 2006).) Despite the high standard of proof, "any doubts must be resolved in favor of disqualification." *Smith*, 2006 WL 127966, at *2 (citing *Sauer v. Xerox Corp.*, 85 F. Supp. 2d 198, 199 (W.D.N.Y. 2000)); *see also Gonzales v. Cent. Elec. Coop.*, Nos. 08-cv-6236-HO, 08-cv-6240-HO, 2008 WL 11409430, at *2 (D. Or. Oct. 23, 2008) (resolving dispute of fact in favor of party seeking disqualification).

Oregon law governs this matter because federal courts apply state law in determining matters of disqualification. *See In re Cty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("[F]ederal courts apply state law in determining matters of attorney disqualification."). If a federal court identifies a conflict of interest, it has the discretion to disqualify counsel. *See Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir. 1996).

## II. DISCUSSION

Defendants argue that VF's representation of the Association in this matter violates Oregon Rule of Professional Conduct ("RPC") 1.9, which prohibits an attorney from representing a client whose interests are materially adverse from those of a former client in a matter that is substantially related, without the written consent of all parties.[6] (Defs.' Mot. at 6-9 (citing Or. R. Prof'l Cond. 1.9(a)).) Defendants argue that the Directors subjectively believed that VF represented them and that this belief was objectively reasonable. (Defs.' Mot. at 13-26.) Further, Defendants argue that because of this belief, the Directors turned over their entire files to VF and shared confidential information with VF's attorneys, believing that it was protected by the attorney-client privilege. (Defs.' Mot. at 11-12.) Accordingly, Defendants assert that VF's

---

[6] In their Reply, the Decatur Defendants also argue that VF must be disqualified because Harris will be a necessary witness in the instant litigation. Because the Court finds that VF should be disqualified on the basis of a former client conflict of interest, it will not separately address the Decatur Defendants' argument. (Decatur Defs.' Reply at 1-8.)

continued representation of the Association would be highly prejudicial to their interests in the current litigation. (*Id.*) The Court agrees.

A.  **Legal Framework**

The Oregon Supreme Court has articulated a two-part test to determine whether a conflict of interest exists under RPC 1.9. *See In Re Bristow*, 301 Or. 194, 201 (1986) (setting forth analytical framework to resolve conflict of interest issues under Oregon law). The first step is to determine whether an attorney-client relationship existed. *Id.* If the court determines that such a relationship existed, it should then analyze whether, under the applicable rules, a conflict occurred. *Id.* Here, the Association acknowledges that the current matter is substantially related to *Quatama I*, that the parties are materially adverse, and that therefore a conflict exists *if* VF formerly represented the Directors. Thus, the only issue for the Court to decide is whether an attorney-client relationship existed between VF and the Directors.

"The existence of a lawyer-client relationship does not depend upon a formalized agreement." *In re Hassenstab*, 325 Or. 166, 172 (1997). An attorney-client relationship may be implied when two elements are present: "(1) the putative client subjectively believes the relationship exists and (2) the putative client's belief is objectively reasonable and based on evidence of objective facts on which a reasonable person would rely as supporting existence of that belief." *Jimenez v. Rivermark Comm. Credit Union*, No. 3:15–cv–00128–BR, 2015 WL 2239669, at *4 (D. Or. May 12, 2015) (citing *In re Weidner*, 310 Or. 757, 768 (1990) (quotation marks omitted)). Proof of the objective reasonableness of a party's belief in the existence of an attorney-client relationship should be based upon "facts on which a reasonable person would rely as supporting [the] existence" of the attorney-client relationship, including evidence that "the lawyer acted in a way that would induce a reasonable person in the client's position to rely on the lawyer's professional advice." *Weidner*, 310 Or. at 770. Further, "[t]he evidence must show that

PAGE 9 – OPINION AND ORDER

the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client . . . ." *Id*. If the lawyer should have understood that a relationship existed or was providing professional assistance on behalf of the client, his or her "subjective belief in the nonexistence of a relationship is irrelevant." *Admiral Ins. Co. v. Mason, Bruce & Girard, Inc.,* No. Civ. CV 02–818–HA, 2002 WL 31972159, at *2 (D. Or. Dec. 5, 2002).

### B. The Directors Had a Subjective Belief that VF Represented Them

Under the first prong of the *Weidner* test, a person claiming the existence of an attorney-client relationship must demonstrate that he had the subjective belief that the relationship existed. *Weidner*, 310 Or. at 768. There is no requirement that the person submit any documentary evidence beyond his own testimony to establish this subjective intent. *See Westerlund Log Handlers, LLC v. Esler*, No. 3:16-cv-922-SI, 2018 WL 614706, at *10 (D. Or. Jan. 29, 2018) (accepting the parties' testimony that they believed attorney represented them as sufficient to demonstrate subjective intent). Here, each of the Directors submitted declarations asserting that they believed VF served as their legal counsel with regard to their Board service. (Wilson Decl. ¶¶ 3-7; McFerran Decl. ¶¶ 3-5; Anderson Decl. ¶¶ 3-6.) Further, each of the Directors stated that had they believed VF did not represent them, they would have hired their own counsel to represent them before providing VF with any of their files relating to the Quatama Park development. (Wilson Decl. ¶ 5; McFerran Decl. ¶ 4; Anderson Decl. ¶ 4.) These declarations are sufficient to establish that the Directors subjectively believed they had an attorney-client relationship with VF.

///

C.  The Directors' Belief Was Objectively Reasonable

The Directors' belief that VF represented them was objectively reasonable for several reasons supported by documentary evidence in the record. *See* Weidner, 310 Or. at 770 (noting that a client's belief in the existence of attorney-client relationship must be supported by objective facts).

First, neither the general representation agreement nor the contingent fee agreement between the Association and VF contained any provisions expressly disclaiming VF's representation of board members. Furthermore, VF never informed the Directors in writing that VF did not represent them.[7]

Second, after the Directors were served with subpoenas in *Quatama I*, Harris requested that they turn over their entire files to VF so that Harris could perform a privilege review. (Pl.'s Resp. at 32; Defs.' Reply at 6.) While the Association asserts that Harris was only concerned about preserving privilege on behalf of the Association, a reasonable person in the position of the Directors would believe Harris was also acting in the Directors' interests. (Pl.'s Resp. at 11.) The fact that Harris did not advise the Defendants to retain their own counsel to review the responsive documents, which likely also contained personal information and non-Association business, supports this conclusion. In addition, even after Wilson and McFerran left the Board, Harris planned to prepare the Directors for their depositions in *Quatama I*, as well as to defend the depositions themselves. (*See generally* Miller Decl. Ex. 10.) It was reasonable for the

---

[7] Although Harris states in his declaration that he was confident that Wilson and McFerran understood that he only represented the Association, an attorney's "subjective belief in the nonexistence of a relationship is irrelevant," if he or she pursued legal actions on behalf of the client. *Admiral Ins. Co.*, 2002 WL 31972159, at *2. Further, in deciding a motion to disqualify, a court must resolve any doubts in favor of the party seeking disqualification. *Smith*, 2006 WL 127966, at *2 (citing *Sauer*, 85 F. Supp. 2d at 199).

Directors to believe that the attorney who prepares them for and defends their depositions was acting as their counsel.

Third, when the Directors were threatened with breach of fiduciary duty claims in their individual capacities, on several occasions Harris acted as if he was providing legal assistance to the Directors. *See Weidner*, 310 Or. at 770 (noting that to establish existence of an attorney-client relationship, "[t]he evidence must show that the lawyer . . . acted as though the lawyer was providing professional assistance or advice on behalf of the putative client . . . .") Throughout the summer of 2016, after homeowners had alleged that the Directors were breaching their fiduciary duties to the Association, Harris repeatedly met with McFerran and Wilson to advise them how to respond to the homeowners' allegations. (Defs.' Reply at 11-12.) In August 2016, when Henrie wrote the Board a letter to place them on notice that the homeowners intended to pursue claims against the Directors for breach of fiduciary duty, Harris responded on the Directors' behalf. (McFerran Decl. to Decatur Defs.' Reply Ex. F, at 1-4.) Additionally, in January 2017, after counsel for the *Quatama I* defendants moved to amend their third-party complaint to add claims against the Directors, Harris tendered the claims to the D&O insurance carrier. (Defs.' Reply at 5; McFerran Decl. to Decatur Defs.' Reply Ex. G, at 2.) Any of these events should have put VF on notice that the interests of the Association and those of the Directors were, or could become, adverse. VF's continued representation of the Directors despite these events supports the conclusion that the Directors reasonably believed VF represented them.

The Association's arguments in response are unpersuasive. First, the Association asserts that the Directors regularly sought counsel from other attorneys on Association matters, notably Grant, counsel for Lamplight. (Pl.'s Resp. at 14-16.) However, an attorney-client relationship does not end merely because the client has sought or relied upon the advice of multiple attorneys.

*See In re Galton*, 289 Or. 565, 581 (1980) (in disciplinary proceeding, determining that an attorney-client relationship existed between attorney and a corporation even when the corporation employed other counsel and did not have a retainer agreement with the attorney). The Association also argues that the Directors failed to maintain the confidentiality of their communications with VF. (Pl.'s Resp. at 17-18.) However, a client's disclosure of confidential communications to a third party does not terminate the attorney-client relationship. *See, e.g., In Re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 247 (D.N.J. 2000) (holding that former board member's disclosure of privileged information to corporation's audit committee was immaterial to court's determination that board member was represented by attorney, thus conflict of interest existed).

The Association further argues that any legal advice VF gave the Directors was necessary for VF to comply with RPC 1.13, which provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." (Pl.'s Resp. at 18-20 (citing Or. R. Prof'l Cond. 1.13(a).) However, the rule also provides that "a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing." Or. R. Prof'l Cond. 1.13(f). As discussed above, VF did not explain the identity of its client (i.e., solely the Association) to the Directors even after VF reasonably should have known that the Association's interests were adverse to the Directors' individual interests. Thus, while the Court acknowledges that VF could only represent the Association through its directors pursuant to RPC 1.13(a), this rule does not obviate VF's obligation to be clear about who it represents and to identify any potential conflicts of interest. *Cf. In re Conduct of Campbell*, 345 Or. 670, 681-82 (2009) (interpreting RPC 1.13 and holding that an attorney who had represented

a bankruptcy estate could not later file a claim on behalf of the estate against the bankruptcy trustee).

Finally, the Association argues that Defendants rely upon incorrect standards to seek VF's disqualification, specifically because the Oregon Supreme Court has held that "the appearance of impropriety" may not be the sole basis for disqualification. (Pl.'s Resp. at 27) (citing *In re Ainsworth*, 289 Or. 479, 493 (1980).) The Association is correct that the appearance of impropriety is not, standing alone, grounds for attorney discipline. *See In re Conduct of Jans*, 295 Or. 289, 294 (1983) ("[A]lthough the existence of an 'appearance of impropriety' is not, of itself, a basis for discipline, such conduct by a lawyer, if known to others, adversely affects public confidence in the legal profession.") However, the Directors here have alleged a violation of RPC 1.9, not a mere appearance of impropriety.

### D. Balancing of Interests

The Association argues that it will suffer undue prejudice if the Court grants the motion to disqualify counsel.[8] The Court acknowledges the important interests on both sides of this issue. As one court explained, "[t]he court must balance the hardships to the client whose lawyer is sought to be disqualified against the potential harm to the adversary. . . . The court balances . . . the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." *Cendant*, 124 F. Supp. 2d at 249 (citations and quotation marks omitted).

---

[8] The Association also argues that Defendants have waived their ability to pursue the motion through unreasonable delay. (Pl.'s Resp. at 30.) However, the Court finds this argument unpersuasive because even before the Association filed this lawsuit, Peterson promptly objected to VF's continued representation of the Association. (Miller Decl. Ex. 4, at 1-2.) *See also Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983) (noting that a party who does not promptly object to a former attorney's representation of an adverse party may waive that right, but not requiring that the objection be in the form of a motion to the court).

Here, the Association will undoubtedly suffer prejudice if VF is disqualified as its attorney. However, Defendants will suffer greater prejudice if VF continues as the Association's counsel in light of its conflict of interest. In particular, the Directors face significant prejudice as a result of the confidential information, documents, and communications that VF obtained during the course of its prior representation, especially with respect to the breach of fiduciary duty claims alleged against the Directors.[9] *See Cargill*, 2007 WL 1813762, at *12 (citing *Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975)) ("Where it can be reasonably said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation, it is the court's duty to order the attorney disqualified."). Accordingly, the circumstances present here warrant disqualifying VF as the Association's counsel.

## CONCLUSION

For the aforementioned reasons, the Court GRANTS Defendants' Motion to Disqualify Counsel (ECF No. 21), and directs the Association's new counsel to file a Notice of Appearance within forty-five (45) days.

DATED this 3rd day of August, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

---

[9] While VF represented during oral argument that it would shield Harris from further involvement in these proceedings, this proffered solution will not cure the potential prejudice because other VF attorneys and staff were necessarily privy to the information obtained from the Directors, which remains in the possession of the firm. Nor is it compelling that the Association now claims that none of the relevant information obtained by VF remains privileged, especially where only VF has made that determination. *See Cargill Inc. v. Budine*, No. CV-F-07-349-LJO-SMS, 2007 WL 1813762, at *12 (E.D. Cal. June 22, 2007) (in deciding a motion to disqualify, the district court held that the party opposing attorney disqualification was not in a position to determine whether the documents in its possession, obtained from the adverse party in a prior proceeding, were confidential or privileged).