IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **QUATAMA PARK TOWNHOMES OWNERS ASSOCIATION**,<br><br>Plaintiff,<br><br>v.<br><br>**RBC REAL ESTATE FINANCE, INC.; LAMPLIGHT CAPITAL & ASSET MANAGEMENT, LLC; DECATUR ADVISORS LLC; SCOTT McFERRAN; LAURA WILSON, and DARON ANDERSON**,<br><br>Defendants. | Case No. 3:18-cv-00023-SB<br><br>**OPINION AND ORDER** |

Michael J. Vial, VIAL FOTHERINGHAM LLP, 17355 SW Boones Ferry Road, Suite A, Lake Oswego, OR 97035. Of Attorneys for Plaintiff.

Graham B. Miller and Ryan M. Tarter, WOOD, SMITH, HENNING & BERMAN LLP, 12755 SW 69th Avenue, Suite 100, Portland, OR 97223. Of Attorneys for Defendants Scott McFerran, Laura Wilson, and Daron Anderson.

Kurt C. Peterson, KILMER, VOORHEES & LAURICK PC, 732 NW 19th Avenue, Portland, OR 97209. Of Attorneys for Defendants Decatur Advisors, LLC and Scott McFerran.

George S. Pitcher and David C. Campbell, LEWIS BRISBOIS BISGAARD & SMITH LLP, 888 SW Fifth Avenue, Suite 900, Portland, OR 97204. Of Attorneys for Defendants Decatur Advisors LLC and Scott McFerran.

Anne R. Beehler and Hal Mark Mersel, BRYAN CAVE LLP, 3161 Michelson Drive, Suite 1500, Irvine, CA 92612; Eric D. Lansverk and Joseph A.G. Sakay, HILLIS CLARK MARTIN AND PETERSON PS, 999 Third Avenue, Suite 4600, Seattle, WA 98104. Of Attorneys for Defendants RBC Real Estate Finance, Inc.

Klarice A. Benn, ABBOTT LAW GROUP PC, 215 SW Washington Street, Suite 300, Portland, OR 97204. Of Attorneys for Defendant Lamplight Capital & Asset Management LLC.

**Michael H. Simon, District Judge.**

Plaintiff Quatama Park Townhomes Owners Association ("Association") brings this lawsuit (*Quatama II*) against six defendants. Four defendants, Scott McFerran ("McFerran"), Laura Wilson ("Wilson"), Daron Anderson ("Anderson"), and Decatur Advisors LLC ("Decatur") (collectively, the "Moving Defendants"), move to disqualify the law firm of Vial Fotheringham LLP ("VF") from continuing to represent the Association in this action. In an Opinion and Order, United States Magistrate Judge Stacie F. Beckerman granted the motion to disqualify the Association's counsel, and the Association timely objected. After reviewing the record and hearing oral argument, the Court finds the Opinion and Order is contrary to law and denies the motion to disqualify.

## STANDARD OF REVIEW

The Federal Magistrates Act grants district courts the authority to delegate certain matters to magistrate judges. *See* 28 U.S.C. § 636(b)(1). In civil actions, a district court may designate a magistrate judge to determine any pretrial matter, except motions for injunctive relief, for judgment on the pleadings, for summary judgment, to permit or deny maintenance of a class action, to dismiss for failure to state a claim, and to involuntarily dismiss an action. 28 U.S.C. § 636(b)(1)(A). For any of these excluded motions, a district judge may designate a magistrate judge to conduct hearings and submit proposed findings of fact and recommendations for disposition. 28 U.S.C. § 636(b)(1)(B).

Rule 72 of the Federal Rules of Civil procedure implements the authority provided by the Federal Magistrates Act. Under Rule 72(a), a magistrate judge may "hear and decide" all referred pretrial matters that are "not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). For pretrial matters referred to a magistrate judge that are dispositive of a claim or defense, in the absence of consent by all parties, Rule 72(b) allows the magistrate judge only to "enter a recommended disposition, including, if appropriate, proposed findings of fact." Fed. R. Civ. P. 72(b)(1).

The terms "dispositive" and "nondispositive" in Rule 72 do not perfectly coincide with the categories listed in 28 U.S.C. § 636(b)(1). For example, a magistrate judge may not issue a temporary restraining order or preliminary injunction, even though such orders are not dispositive. The Ninth Circuit has held that the motions excluded from determination by a magistrate judge under § 636(b)(1)(A) "are not an exhaustive list of all the pretrial matters that are excepted from the magistrate judge's authority." *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1067 (9th Cir. 2004). As explained by the Ninth Circuit, "magistrate judges may hear and determine nondispositive matters, but not dispositive matters[.]" *Mitchell v. Valenzuela*, 791 F.3d 1166, 1168 (9th Cir. 2015). Dispositive matters include those expressly listed in § 636(b)(1)(A), as well as "analogous" matters. *Id*. "To determine whether a motion is dispositive, [the Ninth Circuit has] adopted a functional approach that looks to the effect of the motion, in order to determine whether it is properly characterized as dispositive or nondispositive of a claim or defense of a party." *Id*. at 1168-69.

The distinction between a dispositive motion and a nondispositive matter is significant for the standard of review. When a party timely objects to a magistrate judge's findings and recommendations concerning a dispositive motion, the district judge shall make a *de novo*

determination of those portions of the magistrate judge's proposed findings and recommendations to which an objection has been made. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). When a party timely objects to a magistrate judge's determination of a nondispositive matter, however, the district judge may reject that determination only when it has been shown that the magistrate judge's order is either clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

"To the extent a district judge is concerned about the possibility that assigning a nondispositive matter to a magistrate judge will confine his or her power to revise the outcome, a reference directing the magistrate judge to make recommendations is possible." 12 Charles Alan Wright and Arthur R. Miller, *et al.*, *Federal Practice and Procedure: Civil* § 3069 (3d ed. 2018) ("*Wright & Miller*"). As explained by one district court,

> That certain case dispositive matters must always be referred for recommendations rather than determination does not mandate the converse, *i.e.*, that nondispositive matters must always be referred for determination rather than recommendations. It is evident from the [Federal Magistrates] Act's legislative history that the purpose of the Act's referral and review provisions is to define the limits of the powers which a court may allow a magistrate to exercise, not to restrict the ultimate authority of an Article III court over a case pending before it.

*Delco Wire & Cable, Inc. v. Weinberger*, 109 F.R.D. 680, 685 (E.D. Pa. 1986), quoted in *Wright & Miller*, *supra*, § 3069. "Thus, when a district court judge refers a nondispositive matter to a magistrate judge specifically for recommendation—even though the matter could have been referred for determination—review is plenary . . . ." *Howe Inv., Ltd. v. Perez Y Cia. de Puerto Rico, Inc.*, 96 F. Supp. 2d 106, 113 (D. P.R. 2000); *see also Trone v. Smith*, 621 F.2d 994, 997-98 (9th Cir. 1980) (noting that the magistrate judge only "recommended" that a motion to disqualify counsel be denied, which the district court then reviewed *de novo*).

In the pending lawsuit, the Association urges the Court to treat Magistrate Judge Beckerman's Opinion and Order as findings and recommendations on a dispositive matter and, thus, provide *de novo* review. Defendants, however, argue that a motion to disqualify counsel is a nondispositive matter and that the Magistrate Judge's decision should only be rejected if its factual findings are clearly erroneous or its conclusions are contrary to law. The Court agrees with Defendants. If the Magistrate Judge's decision is upheld, the Association may continue to prosecute all of its claims against each of the Defendants, after obtaining new counsel. Thus, there is nothing in the pending motion to disqualify Plaintiff's counsel that is analogous to any of the motions expressly identified in § 636(b)(1)(A). *See also Howe Inv., Ltd.*, 96 F. Supp. at 113 (holding that a motion to disqualify is a nondispositive matter that a magistrate judge may determine unless the district court referred the matter only for a report and recommendation). Accordingly, the Court will evaluate the Magistrate Judge's factual findings to determine if any are clearly erroneous. More relevant to the pending dispute, however, the Court also will evaluate the Magistrate Judge's legal conclusions to determine if any are contrary to law, which involves a *de novo* review of those issues.[1]

## BACKGROUND

A company owned by James Standring ("Standring") developed a planned residential community in Washington County, Oregon known as "Quatama Park Townhomes" ("Quatama Park"). Other companies owned by Standring provided construction and other services for Quatama Park. The construction lender was RBC Real Estate Finance, Inc. ("RBC"). In 2011,

---

[1] Plaintiff also argues that the Court should undertake *de novo* review based on the "seriousness" of this matter and the "extreme prejudice" to the Association if it may not proceed with its chosen counsel. Many nondispositive matters delegated to a magistrate judge are "serious." Further, a rule that determines the standard of review of a magistrate judge's determination by asking whether the decision in question causes "extreme prejudice" would raise questions of judicial manageability.

RBC foreclosed on the Quatama Park project and became the successor declarant for that development. RBC then hired Decatur to manage the completion of the development.

Wilson and Anderson worked for Decatur. RBC appointed Wilson and Anderson as the sole members of the Association's Board of Directors (the "Board") until control of Quatama Park would be turned over to the lot owners. In July 2013, Lamplight Capital & Asset Management, LLC ("Lamplight") purchased RBC's interest in the project. Lamplight reappointed Wilson and Anderson as the Association's sole directors.

In July 2015, the Board hired VF to provide legal services to the Association as outside general counsel. VF's representation agreement was addressed to the Board, which then consisted of only Wilson and Anderson. There were no other officers or managers of the Association, whose activities were solely directed by Wilson and Anderson. Wilson signed VF's representation agreement as the "Authorized Representative" of the Association. In August 2015, Anderson resigned from the Board, and Lamplight appointed McFerran to replace him. McFerran also worked for Decatur.

In November 2015, the Association engaged VF on a contingent fee basis to file a lawsuit for money damages against Standring's companies and other contractors and sub-contractors, seeking money damages for repairs related to various construction defects. McFerran signed the contingent fee agreement with VF as the "Authorized Representative" of the Board. At that time, Wilson and McFerran were the only directors of the Board. Before filing this lawsuit, attorney Ryan Harris ("Harris") from VF asked both Wilson and McFerran to provide Harris with "any other documents showing other potential defendants."

Also during this time period, Wilson and McFerran were consulting with attorney Eugene Grant of Davis Wright Tremaine LLP ("Davis Wright"). In response to a request to Wilson and

McFerran from VF sent on November 2, 2015, Eugene Grant of Davis Wright responded to VF as follows:

> Thanks for your advice and assistance. I will be consulting with Scott [McFerran] and Laura [Wilson] and the other members of the Lamplight team today and will get back to you ASAP today regarding the assessment allocation method. We understand there are risks whichever way we allocate and assess the unit repair costs, but do not fully agree with your analysis. I will explain more fully our position.

ECF 25-1 at 196 (Ex. 44). Wilson and McFerran ultimately did not provide any documents in response to Harris's request. VF filed the *Quatama I* lawsuit on behalf of the Association.

In mid-2016, several homeowners threatened to sue Lamplight, Wilson, and McFerran over repair costs relating to the alleged construction defects. In June 2016, one homeowner sent an email to Harris at VF, suggesting that Wilson and McFerran had breached their fiduciary duties owed to the homeowners by commencing the *Quatama I* lawsuit for construction defects without adequately determining whether the costs for that litigation would be recovered. Harris forwarded that email to Wilson and McFerran, asking for their response. Harris then responded to the homeowner, commenting that a disagreement over whether to file the lawsuit did not necessarily mean that the Board was breaching its fiduciary duties. During the next two months, Harris met with Wilson and McFerran in person and spoke with them by telephone to discuss the homeowners' allegations.

In August 2016, the defendants in *Quatama I*, Standring's companies, issued subpoenas to Wilson and Decatur for documents relating to the development. Wilson and McFerran provided their complete files to Harris at VF. Anderson also provided Harris with all of his documents related to the development. At some point in reviewing these files, Harris discovered documents purportedly showing that Wilson, McFerran, or Anderson may have known about the construction defects at the development as early as 2012.

PAGE 7 – OPINION AND ORDER

On August 29, 2016, Damon Henrie ("Henrie"), an attorney for several homeowners at the Quatama Park development, sent a letter to Harris and counsel for Lamplight and RBC. Henrie's letter placed those counsel on notice that Henrie's clients intended to pursue claims against Lamplight, McFerran, and Wilson. On September 1, 2016, after soliciting comments from Wilson and McFerran, Harris replied to Henrie.

In January 2017, the defendants in the *Quatama I* lawsuit moved for leave to amend their third-party complaint to assert contribution claims against the Wilson, McFerran, and Anderson. On their behalf, Harris tendered these claims to the Association's Directors and Officers Insurance carrier. In March 2017, Wilson and McFerran resigned from the Board, which then transitioned to homeowner control. Shortly before that transition, however, Harris informed Wilson and McFerran that Harris had received a settlement offer from the *Quatama I* defendants. Harris stated that he believed "we can do better" and recommended that Wilson and McFerran allow the Association's new Board to make that decision. Wilson and McFerran agreed.

In April 2017, the *Quatama I* defendants moved for summary judgment, arguing that the applicable statute of limitations had expired. They presented evidence that the Association's previous directors had known about the construction defects more than two years before the lawsuit was filed. Also in April 2017, Harris exchanged emails with Wilson, McFerran, and Anderson regarding requests for their depositions by the *Quatama I* defendants. Harris also offered to represent Wilson, McFerran, and Anderson at those depositions. The depositions, however, had not yet occurred when, in May 2017, Harris sent a letter to counsel for RBC stating that the recently-elected directors of the Association (*i.e.*, the homeowners or lot owners) did not believe it was in the Association's best interest to sign a common interest agreement among the Association, Wilson, Decatur, RBC, and Lamplight.

On June 19, 2017, Harris sent a letter to Wilson, McFerran, and Anderson, informing them that, if the *Quatama I* defendants' motion for summary judgment is granted, the Association may file a breach of fiduciary duty lawsuit against Wilson, McFerran, and Anderson, based on their failure timely to authorize the filing of lawsuit after discovering the construction defects. Harris also explained that, after the defendants in *Quatama I* had requested to take the depositions of the former directors, Harris initially had intended to defend those depositions, but "as the Association's lawyer, I can no longer do that." Harris also advised Wilson, McFerran, and Anderson to consult their own counsel. Wilson, McFerran, and Anderson then retained their own counsel, Kurt Peterson ("Peterson"). On July 10, 2017, Peterson told Harris that the three former directors of the Association (Wilson, McFerran, and Anderson) all believed that they each personally had formed an attorney-client relationship with the VF law firm. On July 17, 2018, Peterson wrote to VF, stating that if VF pursued litigation against the former Directors on behalf of the Association, he would move to disqualify VF as Plaintiff's counsel.

In August 2017, the Washington County Circuit Court granted summary judgment in favor of the *Quatama I* defendants. On October 5, 2017, the Association, through its counsel VF, filed this lawsuit in state court, alleging claims of fraud, negligent misrepresentation, breach of fiduciary duty, and unlawful trade practices. On January 3, 2018, Defendants timely removed the action to federal court. On May 1, 2018, Wilson, McFerran, and Anderson moved to disqualify VF as counsel for the Association. Shortly thereafter Decatur (as well as McFerran) joined that motion. After receiving the parties' briefs and hearing oral argument, Magistrate Judge Beckerman issued her Opinion and Order, granting Defendants' motion to disqualify Plaintiff's law firm. Plaintiff timely objected, seeking review by the district court.

## DISCUSSION

### A. Choice of Law When Considering Motions to Disqualify Counsel

Federal law determines the ethical standards of attorneys appearing in federal court. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985) ("Federal courts admit and suspend attorneys as an exercise of their inherent power; the standards imposed are a matter of federal law."). "The district court has the duty and responsibility of supervising the conduct of attorneys who appear before it." *Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir. 1996). As the Ninth Circuit explained long ago, "[w]hen an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct." *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964), *clarified*, 370 F.2d 418 (1966). "The right to disqualify counsel is a discretionary exercise of the trial court's inherent powers." *Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003).

Congress has authorized all federal courts to "prescribe rules for the conduct of their business." 28 U.S.C. § 2071(a). Many district courts have adopted the standards and rules governing the professional conduct of lawyers that apply in the jurisdiction in which the court sits. *See generally* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 1 cmt. b (2000) ("Federal district courts generally have adopted the lawyer code of the jurisdiction in which the court sits, and all federal courts exercise the power to regulate lawyers appearing before them."). Even when a district court, however, has adopted, through its local rules, a state's ethical code governing lawyers, some circuits direct that the state codes are not the sole authority governing a motion to disqualify. *See, e.g.*, *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). In addition, according to the law in some circuits, "we consider the motion [to disqualify] governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *Id.*

Other circuits approach the choice of law question differently. When considering a motion to disqualify counsel in the Ninth Circuit, at least when a district court has adopted by local rule the ethical code governing lawyers promulgated by the state in which that court sits, federal courts are directed to apply the law of the forum state and "must follow the reasoned view of the state supreme court when it has spoken on the issue." *In re Cty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *see also Radcliffe v. Hernandez*, 818 F.3d 537, 543 (9th Cir. 2016) (quoting *Cty. of Los Angeles*). If, however, a district court has not adopted its forum state's code of professional conduct, the question of choice of law is less clear, at least in the Ninth Circuit. *See Unified Sewerage Agency of Washington Cty., Oregon v. Jelco, Inc.*, 646 F.2d 1339, 1342 n.1 (9th Cir. 1981) ("We express no opinion on the law to apply where the district court has not designated the applicable rules of professional responsibility (*e.g.*, state law, the Model Code of Professional Responsibility, or a federal common law of professional responsibility).").

At the time this action (*Quatama II*) was filed, the District of Oregon's local rules for civil cases provided in relevant part that every attorney admitted to general or special practice in this district must "[b]e familiar and comply with the Oregon State Bar Standards of Professional Conduct and this Court's Statement of Professionalism." LR 83-7(a). There was, however, no such document known as the "Oregon State Bar Standards of Professional Conduct." Instead, effective January 1, 2005, the Oregon Supreme Court adopted the Oregon Rules of Professional Conduct, which replaced the Oregon Code of Professional Responsibility. *See In re Conduct of Ellis*, 356 Or. 691, 693 n.1 (2015).[2] If the Court construes the "Oregon State Bar Standards of Professional Conduct" as referring to the Oregon Rules of Professional Conduct, which it does,

---

[2] The current version of LR 83-7(a) provides that every attorney admitted to general or special practice in the District of Oregon must "[b]e familiar and comply with the Oregon Rules of Professional Conduct and this Court's Statement of Professionalism." LR 83-7(a).

then the Court "must follow the reasoned view of the state supreme court when it has spoken on the issue." *In re Cty. of Los Angeles*, 223 F.3d at 995. If, however, the District of Oregon's then-existing local rules are deemed to have not formally adopted the Oregon Rules of Professional Conduct, then, at a minimum, the Court considers the rules as guideposts. *See Jimenez v. Rivermark Cmty. Credit Union*, 2015 WL 2239669, at *2 (D. Or. May 12, 2015) (explaining that "in this case Oregon's Rules of Professional Conduct serve as guideposts for this Court to analyze Plaintiff's Motion [to Disqualify Counsel]"). In the context of the pending motion, the result would be the same.

**B. Heightened Judicial Scrutiny of Motions to Disqualify Opposing Counsel**

Disqualification "ultimately involves a conflict between a client's right to chosen counsel and the need to maintain ethical standards of professional responsibility." *Certain Underwriters at Lloyd's, London*, 264 F. Supp. 2d at 918 (citation and quotation marks omitted). "[B]ecause a motion to disqualify is often tactically motivated, and can be disruptive to the litigation process, it is a drastic measure that is generally disfavored. . . . At the same time, the paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *Id*. (citation and quotation marks omitted).

The Ninth Circuit has cautioned: "The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant." *Optyl Eyewear Fashion Int'l. Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985). Further, "[b]ecause of this potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny." *Id*. (citation and quotation marks omitted).

**C. Oregon Rules of Professional Conduct**

As explained by the Oregon Supreme Court, "[t]he disciplinary rules are standards adopted by this court to govern the supervision and discipline of attorneys." *Brown v. Or. State*

PAGE 12 – OPINION AND ORDER

*Bar*, 293 Or. 446, 451 (1982). The two Oregon Rules of Professional Conduct ("RPC") most relevant to the pending dispute are RPC 1.9 and RPC 1.13. They provide as follows:

> RPC 1.9 ("Duties to Former Clients") provides in relevant part:
>
>> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless each affected client gives informed consent, confirmed in writing.
>>
>> \* \* \*
>>
>> (d) For purposes of this rule, matters are "substantially related" if (1) the lawyer's representation of the current client will injure or damage the former client in connection with the same transaction or legal dispute in which the lawyer previously represented the former client; or (2) there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter.
>
> RPC 1.13 ("Organization as Client") provides in relevant part:
>
>> (a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.
>>
>> \* \* \*
>>
>> (f) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent may only be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

**D. Application**

In *Christensen v. United States District Court for the Central District of California*, the Ninth Circuit granted a petition for mandamus and vacated an order of disqualification. 844 F.2d 694, 699 (9th Cir. 1988). After the Beverly Hills Savings and Loan Association ("BHSL") became insolvent, the Federal Savings and Loan Insurance Corporation ("FSLIC") placed BHSL

into receivership. *Id*. at 696. FSLIC then brought a civil lawsuit against BHSL's former management groups, the Fitzpatrick group and the Amir group, alleging mismanagement and various regulatory violations. *Id*. Terry Christensen was a partner in the law firm of Wyman, Bautzer, Christensen, Kuchel & Silbert ("Wyman"). The Wyman law firm had previously provided legal services to BHSL and the Amir group, including investigating wrongdoing by the Fitzpatrick group. Christensen also served as an outside director of BHSL while the Amir group was in control of BHSL. FSLIC did not name Christensen as a defendant in the lawsuit, but the Fitzpatrick group later brought Christensen into the case as a third-party defendant.

Wyman appeared as counsel for both Christensen and the Amir group. FSLIC moved to disqualify Wyman based on Wyman's previous work for BHSL. After the district court found that FSLIC was the successor to BHSL and that a "substantial relationship" under the California Rules of Professional Conduct existed between Wyman's former representation of BHSL and its current representation of Christensen, the district court granted FSLIC's motion to disqualify the Wyman law firm. Christensen sought mandamus. The Ninth Circuit granted that petition and vacated the district court's order disqualifying Wyman from representing Christensen in the action. Most significantly to the present lawsuit, the Ninth Circuit held in *Christensen* that

> we adopt the rule of *Allegaert* that the substantial relationship test is inapplicable when the former client has no reason to believe that information given to counsel will not be disclosed to the firm's current client. Due to the unique relationship between BHSL, Christensen, and Wyman, there are no BHSL "confidences" that could be inappropriately disclosed by Wyman to Christensen.

*Christensen*, 844 F.2d at 699.[3]

---

[3] The Ninth Circuit added in a footnote: "This case involves a law firm's representation of an individual who was both a director and a law firm partner. Therefore, we express no opinion on the situation where a firm attempts to represent an outside director who is not a member of the firm in litigation against the corporation." *Christensen*, 844 F.2d at 699 n.8. That qualification, however, is irrelevant to the pending dispute because the VF law firm is

In *Christensen*, the Ninth Circuit explained the *Allegaert* rule that it adopted. According to the Ninth Circuit:

> Therefore, as explained by the Second Circuit in *Allegaert v. Perot*, 565 F.2d 246 (2d Cir.1977), the substantial relationship test is not implicated unless the attorney was in a position where he could have received information that his former client might reasonably have assumed the attorney would withhold from his present client. *Id*. at 250 . . . . In *Allegaert*, the bankrupt Walston corporation sought disqualification of defendant Perot's counsel, the law firms of Weil, Gotshal and Leva, Hawes. The firms had represented the DGF Corporation and the Perot group that managed it. The Perot group had formerly been in charge of Walston. Weil, Gotshal and Leva, Hawes had represented Walston when the Perot group controlled it and had realigned it with DGF. Moreover, after the realignment, the law firms performed work for Walston related to the action in which disqualification was sought. The court did not apply the substantial relationship test because Walston necessarily knew that the information given to the law firms would be conveyed to their primary clients, DGF and the Perot group. *Allegaert*, 565 F.2d at 250.

*Christensen*, 844 F.2d at 698 (additional citations omitted). In *Christensen*, the Ninth Circuit noted that the facts in that case were very similar to the facts in *Allegaert*. "BHSL necessarily knew that any information it gave to Wyman would be conveyed to Christensen as a BHSL director and a senior partner in the law firm." *Id*.

Similarly, in *Exterior Sys., Inc. v. Noble Composites, Inc*., United States Magistrate Judge Nuechterlein well summarized *Allegaert* as follows:

> *Allegaert* described a situation where a lawyer continuously represented a primary client, but then accepted joint representation with a secondary client. Later, the interests of the two clients diverged on matters relating to the joint representation. *Allegaert* held that the lawyer could continue to represent the primary client against the secondary client because the secondary client "necessarily knew that information given to [the lawyers] would

---

representing the Association against a former outside director, not the other way around. The *Christensen* footnote might apply when a law firm continues to represent an entity's former outside director against the entity that was also the former primary client of the law firm.

PAGE 15 – OPINION AND ORDER

> certainly be conveyed to their primary clients." *Id*. at 250. The
> substantial relationship test was "inapposite" because the
> secondary client had no expectation that the information acquired
> by the lawyers would be kept secret from the primary client. *Id*.
> Since the lawyers had maintained a "continuous and unbroken
> legal relationship with their primary clients," they "have not
> changed sides from a former client to a current, adverse client." *Id*.
> at 251.

175 F. Supp. 2d 1112, 1118 (N.D. Ind. 2001).

The same is true in this case. At all relevant times, the Association was the primary client of VF for purposes of the dispute now before the Court. The VF law firm was retained by the Association "acting through its duly authorized constituents." *See* RPC 1.13(a). For purposes of the pending motion, the Court will assume without deciding that the Moving Defendants reasonably believed that they had formed a secondary attorney-client relationship with VF and, thus, there was a situation of dual representation.[4] Even if there was dual representation, the Moving Defendants would necessarily have known that any information they (as the secondary clients) gave to VF would be conveyed to VF's primary client, the Association. Thus, as the Ninth Circuit held in *Christensen*, the "substantial relationship" test set forth in RPC 1.9 is inapplicable when the purported former secondary clients (the Moving Defendants) would have had no reason to believe that information they gave to VF would not have been disclosed to the law firm's primary (and continuing) client, the Association.[5]

---

[4] That assumption may be cast into doubt because it does not appear that anyone from the Association apart from the Moving Defendants ever consented to dual representation by VF of both the Association and the Moving Defendants. *See* RPC 1.13(f) (requiring consent to dual representation by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders). This is further evidence that there was no dual representation, but for purposes of the pending motion the Court will assume there was.

[5] The Court recognizes that *Christensen* applied California law regarding the California Rules of Professional Conduct. The Oregon Rules of Professional Conduct, however, are not materially different from the California rules on these issues. Further, no party has presented to the Court any legal authority from either the Oregon Supreme Court or the Oregon Court of

PAGE 16 – OPINION AND ORDER

Based on the Ninth Circuit's decision in *Christensen*, the Court concludes that it was contrary to law for the Magistrate Judge to apply the substantial relationship test of RPC 1.9 to the facts presented in this case. The Court, however, is not the slightest bit critical of the Magistrate Judge. The fault lies with Plaintiff. As the Magistrate Judge noted in her Opinion and Order:

> Here, the Association acknowledges that the current matter is substantially related to *Quatama I*, that the parties are materially adverse, and that therefore a conflict exists if VF formerly represented the Directors. Thus, the only issue for the Court to decide is whether an attorney-client relationship existed between VF and the Directors.

ECF 38 at 9. Before the Magistrate Judge, the Plaintiff never argued that the substantial relationship test is inapplicable based on the rule of *Allegaert* adopted by the Ninth Circuit in *Christensen*. Had the Plaintiff done so, perhaps the Magistrate Judge would have reached the same conclusion that the Court now holds.

The final matter to address is whether Plaintiff has waived the argument that the substantial relationship test is inapplicable based on the rule of *Allegaert* adopted by the Ninth Circuit in *Christensen*. As *Wright & Miller* explain:

> As a general proposition, limiting objections to rulings by magistrate judges on nondispositive matters to arguments that the orders are clearly erroneous or contrary to law is not only mandated by the statute and the rule but also by wise policy. Many of these orders are of very limited importance, and permitting litigants regularly to impose their dissatisfaction with the magistrate judge's decisions on the district judge would create an undue risk of wasteful activity that could frustrate the purposes of the Act.

---

Appeals indicating that Oregon would not follow the Ninth Circuit's decision in *Christensen* and adopt the Second Circuit's rule in *Allegaert*, and the Court is aware of none. In addition, the D.C. Circuit also appears to follow the *Allegaert* rule. *See Nat'l. Souvenir Ctr., Inc., v. Historic Figures, Inc.*, 728 F.2d 503, 517 (D.C. Cir. 1984).

PAGE 17 – OPINION AND ORDER

*Wright & Miller*, *supra*, § 3069. As discussed above, however, whether to grant a motion to disqualify opposing counsel is not of "very limited importance." Indeed, as the Ninth Circuit has recognized, the "cost and inconvenience to clients" and the risk from "misuse of the rules for tactical purposes is significant." *Optyl Eyewear*, 760 F.2d at 1050. Thus, it would be appropriate for the Court to consider Plaintiff's late-discovered argument, assuming the Court has discretion to do so even though it was not presented to the Magistrate Judge. The Court believes that it does have that discretion.

> As *Wright & Miller* further explain:
>
>> But it is also important to avoid the conclusion that district judges are absolutely powerless to alter magistrate-judge resolution of nondispositive matters unless they fall into the clearly erroneous category. At bottom, the power to review is necessary to avoid constitutional difficulties, and an absolute prohibition on revision by the district judge creates risks of undermining that essential review authority. . . . Indeed, when a case is shifted from one district judge to another, the second district judge can alter earlier rulings by the first due to simple disagreement, although such actions are rare under the doctrine law of the case.

*Wright & Miller*, *supra*, § 3069 (footnotes omitted) (noting also that it makes little sense for a district court not to be able to reconsider a magistrate judge's opinion when magistrate judges may reconsider their own opinions and district court judges may reconsider their own opinions and that "it would turn the jurisprudential system on its head to ascribe irrevocably finality (akin to that of a final judgment) to any unreviewed discovery or evidentiary rulings by a magistrate judge") (citation omitted). Moreover, even for those courts that adhere to a strict application of the "clearly erroneous" standard, "it is limited to factual findings; even the Third Circuit[6]

---

[6] The Third Circuit has held that when performing a review under the "clearly erroneous" standard for reviewing the factual conclusions of a magistrate judge's nondispositive opinion, a district court may not consider evidence outside the record considered by the magistrate judge. *See Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 93 (3d Cir. 1992), *as amended* (Sept. 17, 1992).

recognized that 'the phrase "contrary to law" indicates plenary review as to matters of law.'" *Id.* (footnote omitted). The latter is the situation that we have here.

## CONCLUSION

Because the Opinion and Order of the United States Magistrate Judge granting Defendants' Motion to Disqualify Counsel (ECF 38) is contrary to law, Defendants' Motion to Disqualify Counsel (ECF 21) is DENIED.

**IT IS SO ORDERED**.

DATED this 18th day of March, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge